**RAY–O–VAC CO. v. GOODYEAR TIRE & RUBBER CO., Inc., et al.**
**Civil Action No. 240–D.**

District Court, E. D. Illinois.

July 22, 1942.

Bernard A. Schroeder, Russell Wiles, and Chritton, Wiles, Davies & Hirschl, all of Chicago, Ill., and Harold F. Lindley, of Danville, Ill., for plaintiff.

William E. Chilton, Charles W. Williams, and Fay, Macklin, Golrick, Williams, Chilton & Isler, all of Cleveland, Ohio, and Everett L. Dalbey, of Danville, Ill., for defendants.

LINDLEY, District Judge.

Plaintiff charges defendant with infringement of its patent, to Anthony, 2,198,423, for a leak proof dry cell flashlight battery. Defendant asserts invalidity and noninfringement and in a counterclaim prays judgment accordingly. The allegedly infringing cell was manufactured by General Dry Batteries, Inc., who defends the suit.

Dry cells are not of recent origin; indeed, the basic elements involved in their proper construction have been well known for many years. In keeping with the development of electrical devices generally, the flashlight battery industry has grown to the extent that some 300,000,000 batteries were sold in the United States in 1941. Despite this development and the efforts of competing companies to perfect their products, two problems have persistently troubled the trade and the user, viz., leakage of electrolyte from deteriorated cells and swelling of exhausted cells to the point of destroying the casings in which they are enclosed.

The conventional dry cell employs a cylindrical cup like zinc electrode serving as a container for a central carbon electrode, electrolyte and depolarizing mix. A closure at the bottom provides the terminal for one electrode and one at the top that for the other. The term dry cell is misleading, for the electrolyte has the consistency of cream, consisting of a mixture of ammonium chloride, zinc chloride, water and starch. After the mixture has been placed in the zinc cup, it is sometimes heated and the starch thereby "gelantinized" into a paste. In use the electrolyte gradually corrodes the zinc until eventually the mixture leaks through the container. Further, if the cell has been short circuited or placed under load for an extended period, certain solids form within as the zinc is eaten away, with resulting expansion of the contents of the cell, and, as a result, the walls of the cell bulge and break and the liquids inside leak out. These liquids usually include zinc chloride and ammonium chloride and, in a short time, injure the metal walls of the flashlight casing. If the leakage is discovered promptly, damage may be minimized by extracting the leaky cell and cleaning the casing. If leaking cells are permitted to remain in the casing for any extended period of time, however, the metal of the case will be corroded and the cells continue to swell and "freeze" to the casing so as to prevent removal and deform and render useless the case. Because of the danger of damage from leaking cells, companies producing and selling batteries and flashlights have usually warned purchasers to remove batteries from flashlights after they have become dead, show signs of oozing, or the flashlight is to be stored for a period of time.

It was with the idea of remedying these defects and eradicating the trouble that Anthony patented his leak proof battery. Claims 1, 2 and 3 in issue read thus:

"1. A leak immunized flashlight dry cell provided with circuit terminals at opposite ends, comprizing: a hollow cylindrical zinc metal electrode containing electrolyte; a centrally disposed carbon electrode and depolarizing-mix in said electrolyte; a bottom closure for the cell affording a terminal for one of the electrodes; a top closure for the cell provided with a terminal for the other electrode electrically insulated from the first mentioned terminal; and a protecting sheet metal sheath insulated from both of said electrodes and enclosing the side walls of said metal electrode and tightly embracing said closures so as to prevent leakage of the electrolyte from the unit.

"2. A device as specified in Claim 1, in which the sheet metal sheath is insulated from both of the electrodes by an interposed sleeve of paper which has been treated to render it moisture resistant and electrically nonconductive.

"3. A device as specified in claim 1, in which the marginal end portions of the metal sheath are turned inwardly to form flanges which overlap the end closures."

Plaintiff admits that all elements included in these claims are old except the last and that the scope of the claimed invention is limited to providing and applying a steel jacket to the conventional cell to make it,

for all practical purposes, leak proof. Under the patent the walls of the steel jacket, insulated from the rest of the cell by interposition of a yielding, nonconducting material, are capable of withstanding great internal pressure without breaking or deformation. The expansion of the weaker zinc wall against the resisting steel jacket presses the insulating material tightly against the steel jacket, so that, even though the electrolyte eats through the zinc wall, it will not penetrate the insulating sheet and the steel walls, or seep downwardly or upwardly. By crimping the steel jacket tightly over the end closures or making the bottom integral with the cylinder, expansion of the cell at the ends is prevented.

The alleged infringing battery is substantially identical with plaintiff's commercial battery, except that the bottom closure of the accused battery is the bottom of the zinc cup, being made noticeably thicker than the zinc side walls to prevent it from corroding and leaking. Plaintiff's commercial device, in addition to the bottom of the zinc cup, which is the same thickness as the side walls, utilizes a steel disc which is held tightly in place by crimping the side walls over it.

Every element in Anthony's combination was shown in one or more prior combinations except that claimed by him in these words: "a protecting sheet metal sheath insulated from both of said electrodes and enclosing the side walls of said metal electrode and tightly embracing said closures so as to prevent leakage of the electrolyte from the unit." This he added to the conventional flashlight battery for the purpose of doing away with the bete noir of battery manufacturers and the bane of consumers —leakage resulting from corrosion and swelling of the cell destroying the flashlight casing or preventing removal of the cell from the container. Plaintiff contends that Anthony was the first to solve these two persistent fundamental problems and frankly admits that his invention lay in providing the insulated steel jacket with firmly gripped end closures for common dry cells so as to withstand gas pressure and mechanical pressure and make the cell practically leak proof.

There is no question under the evidence that the additional element overcame these two trouble makers or that Anthony by his combination solved the problem, not by preventing leakage absolutely but by reducing it to such a minimum as to remove almost entirely the prevalent troubles. His device met with immediate remarkable success. Not only did the sales of plaintiff increase rapidly but they grew in greater proportions than those of other manufacturers in a highly competitive field. It is established, almost as an undisputed fact, that Anthony contributed great utility to the construction of efficient dry batteries for all practical purposes free of leakage and swelling. To this accomplished utility we must give due weight in determination of whether he achieved invention, for, as the Supreme Court has said, it is entirely proper that evidence of great utility of method or device, in some circumstances, be accepted as evidence of invention. Where the new device satisfies an old and recognized want, invention ordinarily should be inferred, rather than the exercise of mechanical skill, for mere skill of the art would normally have been called into action by the generally known want. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 474, 55 S.Ct. 449, 79 L.Ed. 997.

The question of ultimate importance, therefore, is whether what Anthony accomplished was invention; whether, in addition to utility and novelty, what he taught the industry resulted from the exercise of inventive genius on his part or reflected merely the skill of one trained in the art in interpreting the teachings of prior patents and uses of which he had knowledge.

What did Anthony know and with what was he charged in the way of education with respect to the desirability of the metal sheath which he added to the old combination? "The court first looks into the art, to find what the real merit of the alleged discovery or invention is, and whether it has advanced the art substantially. If it has done so, then the court is liberal in its construction of the patent, to secure to the inventor the reward he deserves." Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 63, 43 S.Ct. 322, 328, 67 L.Ed. 523.

O'Harra in 1882 placed a galvanic battery within an insulating container.

Kohn, as early as 1903 in patent 720,592, taught that where, in a battery, the inner container serves as the positive element, the "excitant" will soon eat through the wall and that by enclosing the zinc con-

tainer in a retaining vessel, the battery does not become unfit for use until practically all the zinc has been consumed. He specified that the retaining vessel should be of such material as would not be acted upon by the "excitant," suggesting preferably, brass. It was his idea not to suggest insulation between an outer container and the zinc element but to make the container corrosion resistant.

Byrne, in 1910 in patent 946,009, placed a primary battery in a metal container. He disclosed no purpose to prevent leakage from within but an intent to water proof and protect the battery from rough handling.

Burgess, in 1,188,488 in 1916, called attention to the fact that leakage of cells occurs, leading to their early destruction, and taught that the zinc cup should be enclosed in a wrapping of insulating material. Over this insulated container he slipped a metal cap covering perhaps the upper one third of the cell. Burgess was groping with the problem; he was attempting to prevent leakage and made his prescription of a container of insulated material partially covered by a cap of brass. He did not disclose a complete metal container for the cell, but he did teach use of an insulated container covered in part by another of metal.

Dunn, in the same year in 1,233,204, placed two electric batteries in tandem series in a cylindrical metal container for the purpose of water proofing the combination and making it strong enough to resist physical contact with other objects.

Olaneta, in his application of August 18, 1920, resulting in 1,623,719 issued April 5, 1927, like Burgess, slipped his battery into a casing of "insulating material," in the shape of a cylindrical can provided with a bottom of the same material, thus completely insulating the contained cell from any object with which it might come in contact. The cell, with its insulating cover, was then placed in an outer container in the form of a cylindrical can of any "suitable metallic material," thus insulated from the zinc cup. He prescribed a snug fit so that the "pitch seal" would not flow between the respective containers and so that his combination prevented short circuiting and furnished protection from entrance of moisture from the exterior. He said that the outer container might be made of hard rubber but that it must be water

proof. He evidently was not attempting to prevent leakage from within but seepage from without.

Miller in 1927, in 1,654,823, dealt with a combination to protect the zinc cup from corrosion and swelling. He placed within a metallic casing a container of rubber or other insulating material which in turn held the essential elements of the cell and then placed between the rubber and the outer metallic casing, absorbent cotton to take up any leakage through the rubber container. He was struggling with Anthony's problem and thought he had solved it by prescription of the elements mentioned. His method of solution was far afield from what Anthony did and he disclosed no conception of Anthony's solution.

Smith, in 1930, applied for patent issued November 17, 1936, 2,060,832, saying that he was endeavoring to provide an improved closure or seal for dry cells avoiding various objections encountered in other types of closures. He did not solve the problem confronting Anthony or make any suggestions which could lead by logical deduction to Anthony's conclusion.

In the English patent 438,663, wherein complete specification was accepted November 8, 1935, the patentee described a new closure which would prevent the necessity of sealing the cell with bitumen or any similar composition. The inventor placed his zinc cup within a cylindrical container which he specified should be made of strawboard, fibre or similar insulating material, providing a convenient service for attachment of labels and advertisements. He merely water proofed the cell and made it attractive. He did not teach Anthony how to prevent leakage and swelling. His container would not withstand pressure.

Anthony in his earlier patent of June 11, 1932, 1,991,132, Serial 616,709, struggling with the same problem, made certain suggestions to prevent escape of electrolyte and corrosion but he did not teach what is included in the patent in suit.

Corigliano in 1932 applied for patent, 2,000,510, issued May 7, 1935. He employed the usual cell in a metal cup, in which was inserted a central electrode, and an outer container with insulation between the two latter and the inner cup. He built "a tight seal regardless of temperature conditions," to protect the cell from seepage. He did not prevent swelling or leakage.

Various other delvers in the art discussed the problems with which we are concerned and made their suggestions. None of them, however, accomplished what Anthony did.

It is, apparent, therefore, that when Anthony conceived the idea of placing the cell within a metal container insulated from the cell for the purpose of preventing leakage and swelling, he did something that nobody else had exactly done or taught. Nobody else had solved the problem satisfactorily or suggested the solution which he supplied.

 What did Anthony do? He added to the conventional dry cell a strong outer metal container to prevent swelling and leaking, insulated it from the zinc container and sealed the end closures in such manner as to achieve practical prevention of leakage and swelling. He learned from the prior art that metal containers could be used to water proof dry cells. He learned that certain patentees had employed outer containers of insulating and water proofing character. He did not learn from any of them that, by surrounding the zinc cup with an insulated metal container with proper closures, leakage and swelling, to all appreciable extents, could be eradicated. No one of the prior patents contained any such teaching, nor did any of the prior uses offered in evidence disclose any such suggestion. This was his idea, a new and useful one satisfying a long felt want, followed by commercial success, a striking example of which is the acceptance of plaintiff's battery in competitive bidding by the United States Signal Corps, where long life of the battery in the field is highly desirable. Was this merely perfection of workmanship or was it of that impalpable quality constituting invention? While not all improvement is invention, yet every immediate step in advance which rises to the dignity of creation is entitled to protection and it may result from long careful consideration as well as from a flash of thought. Does it spring from that intuitive faculty of the mind put forth for new results, yielding what had not before existed or bringing to light what had previously lay hidden from vision? Hollister v. Benedict & B. Mfg. Co., 113 U.S. 59, 72, 5 S.Ct. 717, 28 L.Ed. 901. Or, if not the product of the intuitive faculty of the mind resulting from a single brilliant event, does it arise from an inventive faculty which has thoughtfully conserved and correlated the causes and effects of movements and mechanisms which enter into a desired result? Obviously, the ideal line which separates invention from things otherwise produced can never be concisely or specifically defined. Every patent must be considered on its own merits. We must not grant to a single party a monopoly for every slight advance in the art. We must attribute invention only to such achievements as contribute substantial discoveries making novel and useful steps in advance in useful art. If a particular result has been long desired and frequently sought but never attained, ordinarily we may not attribute lack of invention to the device which first achieved the desired result, because it seems that the simplicity of the means is so marked that many believe that they could readily have produced it if required. The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.), 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154. Though the device be simple, and it may seem strange that earlier makers should have failed to take the final step needed to convert their experiments into assured success, the simplicity will not preclude invention. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968; Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177; Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527. Even substitution of metals may constitute invention where it produces a new function and the first practical success in a needed device, in which the substitution makes for increased efficiency. Edison Electric Light Co. v. United States Electric Lighting Co., 2 Cir., 52 F. 300, 308. We attribute invention also to a device filling a needed want where an old result is accomplished in a more facile and efficient way. And if there be doubt and uncertainty as to invention, the fact that a device has gone into general use, displacing things which have previously been employed for similar use, is often sufficient to determine the existence of invention. Boss Mfg. Co. v. Thomas, 8 Cir., 182 F. 811. As the Supreme Court observed in Paramount Publix Corp. v. American Tri-Ergon Corp., supra, if the device satisfies an old and recognized want, if there is any doubt, invention is to be inferred, rather than the exercise of mechanical skill, for the skill of the art

normally will have been called into action by the generally known want.

As Judge Alschuler said, speaking for the United States Circuit Court of Appeals for the Seventh Circuit, Wahl Clipper Corp. v. Andis Clipper Co. in 66 F.2d 162, at page 164: "What is inventive genius? What is mechanical skill? We apprehend the terms are used for want of better ones, and then, too, they suggest, if they do not define, what the writer has in mind. Moreover, the words are of comprehensive and elastic meaning, the use of which is seldom helpful but nevertheless quite tempting. What is genius? What, an inventive genius? May only an inventive genius receive a valid patent? Instead of comparing the mental activities (and eccentricities) of genius and 'the 'mechanic skilled in the art,' it would seem safer and more accurate to study the product itself and, if possible, ascertain the verdict of the public—the ultimate beneficiary of the contribution. In most instances, the judgment of those who pay their money to secure the benefits of the patented article is truer and better than the opinion of experts or the speculations of an arbitrator. Inasmuch as experience is more reassuring than theorizing, and history more certain than prophecy, so the test of public approval, if uninfluenced by detracting factors, must afford the weightiest proof obtainable determinative of invention. In short, in construing the patent statute, which was enacted to promote the useful arts, it is more important to study those developments of the art which are bright with use in the channels of trade than to delve into abandoned scrap heaps and dust-covered books which tell of hopes unrealized and flashes of genius quite forgotten. The somewhat meaningless terms 'inventive genius' and 'mechanical skill' must be clarified by an examination of the article itself, and if the improvement be unusual, or if there be doubt, and the public has given its tribute, the judge should accord to the creator of the article the title of inventor."

■■ Invention is not necessarily absent from a patent, however simple, unless what is produced is logically deducible from the prior art. Williams v. American String Wrapper Co., 7 Cir., 86 F. 641. Here we think there is nothing in the prior art to teach Anthony that what he proposed to do would satisfy the need of the industry. In other words, his conception was not logically deducible from the prior art. His claims are valid.

■■ There is little question as to infringement. Plaintiff's and defendant's batteries are almost identical. Both have the typical zinc cup, the electrolyte, depolarizing compound and the centrally disposed carbon electrode found in the conventional flash light battery. In addition, each has the leak proof; swelling resistant outer steel jacket insulated from the inner zinc cup, and each jacket grips the end closures firmly.

Defendant asserts its avoidance of infringement in that the bottom end closure of its battery is merely the zinc cup made thicker on the bottom than on the walls, while plaintiff employs an end closure consisting not only of the bottom of the zinc cup which it builds the same thickness as the walls, but also a steel disc.

An examination of the claims in the Anthony patent discloses, however, that there is no narrowed specification as to how the end closures are to be formed. The claim merely states, " * * * a bottom closure for the cell affording a terminal for one of the electrodes; a top closure for the cell provided with a terminal for the other electrode, electrically insulated from the first mentioned terminal." It is apparent, and plaintiff admits, that the novel element added to the prior art by Anthony was the metal jacket, and that the other elements, including end closures, the electrolyte, zinc cup, and centrally disposed carbon electrode, were all elements utilized in prior art batteries, and included in combination with the new element. It is true that some of the drawings in the patent illustrate a steel disc used as an end closure, but others illustrate a device in which the bottom closure was integral with the walls. In making a metal container the choice of an integral closure or a separate one gripped tightly by the walls was a mechanic's choice.

■■ Defendant can not escape infringement by copying the essential novel element of the patent, and in doing so merely exercises the mechanic's option as to precise method of manufacture in a respect not the essential part of the invention.

■■ Defendant asserts a defense of file wrapper estoppel and claims that plaintiff is limited to Figure 11 of his patent, which was a drawing of a dry cell with

a metal disc serving as the end closure instead of merely the bottom of the zinc cup as appeared in Figure I. The defense must fail since it is concerned with an element old in the art, not essential to the patent and not claimed as an invention by Anthony.

Judgment will enter finding claims 1, 2 and 3 valid and infringed and dismissing defendant's counterclaim for want of equity.

The findings and conclusions herein contained shall be included in my more formal findings and conclusions entered contemporaneously herewith.