## CRAMPTON MFG. CO. v. CRAMPTON.

### No. 9989.

Circuit Court of Appeals, Sixth Circuit.

Jan. 28, 1946.

Rehearing Denied March 11, 1946.

Writ of Certiorari Denied May 6, 1946.

See 66 S.Ct. 1017.

SIMONS, Circuit Judge, dissenting in part.

———◇———

Frank Parker Davis, of Chicago, Ill. (Frank Parker Davis, of Chicago, Ill., and Wm. Cyrus Rice, of Grand Rapids, Mich., on the brief), for appellant.

Frank E. Liverance, Jr., of Grand Rapids, Mich. (Frank E. Liverance, Jr., of Grand Rapids, Mich., on the brief), for appellee.

Before HICKS, SIMONS and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Basil R. Crampton brought suit against Crampton Manufacturing Company (here-in called the Company) for infringement of Patent No. 2,233,159, issued to him on February 25, 1941. The chief defenses were lack of invention, non-infringement and indefiniteness of disclosure.

Claims 2, 11, 12 and 13 in issue were held valid and infringed by the Company and an injunction and an accounting were ordered. The Company appealed.

The patent was for a "Handle and Operating Lever Assembly for Flushing Tanks." The main objects of the invention were: (1) "to provide a novel handle and activating lever assembly for a flushing tank"; and (2) "to provide an assembly * * * which is simple, compact, and sturdy, and capable of being readily mounted on the tank."

In "Remarks" appearing in the File Wrapper, appellee said, with reference to his patent:

"It was applicant's primary intent to provide a construction including a concealed connection of the handle with the actuating lever * * * as distinguished from the old-fashioned screw attachment * * * while at the same time being capable of being assembled on the flushing tank with a minimum of difficulty.

"In hitherto known handle and operating levers * * * there have always been a relatively large number of separate parts which must be put together at the time of installation. * * * This results in loss of time and * * * presents a distinct likelihood of mislaying or losing one or more of the parts.

"It was to correct these disadvantages that applicant's structure was primarily intended. To this end, applicant discloses an operating lever * * *, base * * *, and handle * * * which are permanently secured together in operative relation at the factory and require only the additional assembly therewith of * * * washer * * * and lock nut * * * at the place of installation, * * *. Practical advantages of simplicity of assembly and the like are entitled to serious consideration by the examiner since they are regarded very seriously by the industry. * * *"

The Crampton patent called for a hollow tube-like mounting escutcheon or spud with a collar fitting against the outside of the flushing tank and a non-circular shoulder adapted to fit into a like-shaped opening in the tank wall. The portion protruding into the tank was threaded to receive a lock

nut which clamped the spud immovably to the tank. Protruding outwardly in flange-like form from the collar were lugs over which an annular skirt, which was formed on the handle, telescoped; and about which the handle skirt was rotatable. In the handle socket formed by the skirt, and cast integrally with it, was a boss of the same depth as the skirt and connected therewith by an integral web which fitted between two of the lugs on the mounting escutcheon, and served as a stop member and determined the extent of rotative movement between the handle and stationary escutcheon. This limiting arrangement also controlled the motion of the lever which was permanently fastened to the handle. A second socket formed in the boss itself had the same cross-sectional shape as that of the right angled extension of the operating lever, and received the end thereof which passed from the inside of the tank through the barrel of the spud and into the boss socket. The lever and handle were rigidly and permanently fastened together by upsetting or swaging a portion of the boss into a notch in the lever extension. An ornamental thimble-shaped ferrule of brass with an elongated aperture therein for receiving the lever extension loosely encircled the end of the threaded sleeve or barrel, the end of the barrel being reduced slightly in diameter so that the lock nut could slip over it and the ferrule to the threaded portion of the barrel. This ferrule was engaged by an integral tongue struck out from the lever extension which prevented the spud from slipping out of position before installation.

The whole assembly was mounted on the tank by passing the lever and end of the barrel through the noncircular opening in the tank and passing a washer and lock nut over the lever and screwing the nut onto the threadings of the barrel and against the inside wall of the flushing tank.

Claim 2 is printed in the margin,[1] as is claim 11,[2] typical of claims 12 and 13.

Appellant insists that the Crampton patent is invalid, so far as claim 2 is concerned, for lack of sufficient disclosure. This is obvious. The ferrule and protruding tongue on the lower extension are the only fastenings constructed "interiorly of the tank" and they cannot in themselves prevent the assembly from coming apart by "axial separation of the handle, fixture and lever," since without a fastening outside the tank the handle and lever extension would not be joined with each other. The claim omits any reference to that vital connection and there is no disclosure by which that connection is dispensed with. Crampton has failed to "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." Title 35 U.S.C.A. § 33; Beidler v. United States, 253 U.S. 447, 40 S.Ct. 564, 64 L.Ed. 1006; Walker on Patents, 6th Ed., Vol. 1, Sec. 160.

Appellant insists that claims 11, 12 and 13 of Crampton are anticipated by Patent No. 1,147,764 issued to Theleen on July 27, 1915. Theleen, the nearest reference, called for an improved leverage mechanism which "can be attached to the tank as a unitary structure."

[1] "2. A handle assembly for the flush valve actuating lever of a flushing tank comprising a hollow mounting fixture extending through said flushing tank, and means for securing the fixture in fixed relation to the tank including a non-circular element on the fixture engageable in a similarly shaped recess in the tank and a nut threaded on the fixture to clamp the same to the tank, a handle rotatable on said fixture and receiving the actuating lever in non-rotative relation thereto, said actuating lever extending through said hollow fixture (coacting) means on the handle and fixture to limit the angular movement of the handle on the fixture, and means disposed interiorly of the tank for preventing axial separation of the handle, fixture and lever."

[2] "11. In combination with a flushing tank actuating lever, a base adapted to be fixedly secured to a flushing tank wall to extend therethrough and having a clamping nut threadedly receivable thereon interiorly of the wall to secure the base to the wall, said base rotatably receiving and limiting the degree of rotation of said lever, and a handle mounted on said base exteriorly of the wall for oscillatory movement with reference to the base, said handle being permanently secured to said lever whereby oscillatory movement of the handle imparts similar movement to the lever, said lever having means thereon to prevent separation of the lever and base, whereby said handle, base and lever may be mounted as a unit on said wall and secured thereon by said nut, said nut being removably engageable with said base by freely telescoping movement over said lever."

Theleen had a bushing with an escutcheon fitting against the tank and a barrel extending therethrough, which received the lever extension. The outer end of the bushing was socket shaped and was pierced on two sides by holes which lined up with a hole through the lever extension. A socket at the end of the handle slipped over the end of the bushing, and the end of the handle lever screwed into these holes and held the assembly together. Control over the rotative motion, between the bushing or barrel, which was stationarily affixed by flanges to the tank, and the handle and lever, was achieved by a slight play between the end of the handle and the holes in the bushing into which it fitted. The assembly was secured by a lock nut which passed over the lever and screwed onto the bushing and against the inside of the tank.

The District Court found that Theleen made no impression upon the art and though developed and manufactured by a corporation specializing in plumbing fixtures, it was sold in limited quantities and was discarded long before the advent of Crampton. The court found that the Crampton patent was of a "simple, strong, durable and permanent construction which Theleen is not." Crampton certainly achieved tremendous commercial success and the District Court concluded that the application of the principles relating to commercial success enunciated by the Supreme Court in Goodyear Co. v. Ray-o-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 595, 88 L. Ed. 721, required a finding of validity. In the Ray-o-Vac case the court said: "These factors" (commercial success) "were entitled to weight in determining whether the improvement amounted to invention and should, in a close case, tip the scales in favor of patentability."

We think that claims 11, 12 and 13 must be sustained as valid claims. If we entertained any doubt as to the validity of these claims, such doubt must be resolved in their favor by the sales record of the Crampton assembly.

The alleged infringing assembly was manufactured in the main under Patent No. 2,313,840, for a valve actuating lever issued March 16, 1943, to Pleasant and Keller. The objects of the Pleasant-Keller patent were to provide a valve actuating assembly having relatively few parts, of simple and sturdy construction, and one that was compact in use and could be readily and conveniently affixed to the wall of a flushing tank and economically manufactured.

The accused device, like Crampton, had an escutcheon or spud with a collar which fitted against the outside of the tank and a non-circular shoulder which fitted into a like opening in the tank wall and a hollow barrel extending therethrough, exteriorly threaded to receive the lock nut which clamped the entire assembly to the tank wall. The handle had a laterally turned head and a skirt which telescoped over the collar, the single lug extending radially from the collar and fitting into an oversize notch in the skirt, the play there-between defining the rotative motion of the handle and the lever to which the lever was joined by a spindle integral with the handle. From the center of the chamber or socket formed by the skirt projected the spindle which extended through the barrel into the tank.

The spindle was circular in cross-section at its inner end, and at its outer tip, though smaller in diameter at the tip. Between these circular portions, it was hexagonal in cross-section. The actuating lever had a short laterally turned tubular portion whose inner end was hexagonal in cross-section and whose outer end was circular. It was designed to slip snugly over the hexagonal and circular tip of the spindle. The circular tip thereof projected entirely through the tubular portion of the lever and was upset or swaged, so that the lever was fixedly secured to the spindle. Thus the motion of the handle was communicated to the lever through the spindle.

Both Crampton and the accused assembly were of a simple design, allowing permanent pre-assembly at the factory. In each, the lever and a portion of the spud could be passed through the opening in the tank wall without dis-assembly, thus permitting the entire unit to be secured in place and made ready for use simply by passing the washer and lock nut over the lever arm and threading the nut onto the barrel into locking position against the tank wall.

In Crampton it was a portion of the lever which rested in the barrel, the point of swaging being on the handle side of the tank, whereas in the accused, the spindle which was an integral part of the handle, rested in the barrel, the point of swaging being on the inner side of the tank wall.

Each of claims 11, 12 and 13 expressly states, among other things, that the base

receives the lever, that the handle is mounted on the base exteriorly of the tank wall, and that the handle is permanently secured to the lever. Obviously, if the base receives the lever and if the handle is mounted exteriorly of the base, then the permanent connection referred to must be on the outside of the tank. The chief difficulty with this is that the claims do not read literally upon the accused construction. The District Court found that the accused structure represented only a colorable departure from Crampton in detail of construction, without change in essential structure. But appellant forcefully points out that the accused construction had as much resemblance to four patents in the prior art, to wit, No. 970,471 to Davis, 1910; No. 1,533,748 to McNeil, 1925; No. 1,638,161 to Kirk, 1927; and No. 1,771,247 to Clemmons, 1930, as to Crampton. In each of these patents the handle was integrally constructed with a spindle which passed through the tank wall for attachment to the lever, and it is obvious that this "spindle" attachment found in Pleasant-Keller was suggested by the four prior patents. It was certainly not suggested by Crampton for he has no such spindle arrangement. In the accused structure the lever was secured at the end of the spindle at a point at which there had to be strength as well as compactness, to permit the clamping nut to pass thereover. This involved a problem not met with either in Crampton or in the prior art.

The Crampton patent is not a primary or pioneer patent. It "relates to improvements in handle and operating lever assembly for flushing tanks." Usable lever arrangements had long been known in the art. Crampton achieved simplicity, compactness, sturdiness and ready mountability, but these achievements were the result of improvements in an old art.

Crampton is entitled to a limited range of equivalents (The Paper Bag Patent case, 210 U.S. 405, 28 S.Ct. 748, 52 L. Ed. 1122) and, in determining just what he is entitled to, it must be kept in mind that in his claims he has limited himself to the form, location and functions of his handle, base and lever. D'Arcy Spring Co. v. Marshall Vent. Mattress Co., 6 Cir., 259 F. 236. He supplied his own dictionary (Cincinnati Rubber Mfg. Co. v. Stowe-Woodward, Inc., 6 Cir., 111 F.2d 239) to define his understanding of the location and functions of his handle. In the specifica-

tion he refers to it as a suitable handle which actuates the lever from the exterior of the tank, the mounting of which on the said actuating lever constitutes one feature of the present invention. He thus eliminates entirely the "spindle" arrangement of the accused device which connects with the lever and actuates it from the inside of the tank. Whether he did this to protect his patent from anticipation by the prior art and especially by Davis, McNeil, Kirk and Clemmons, is not material.

In Directoplate Corp. v. Donaldson Lithographing Co., 6 Cir., 51 F.2d 199, this court discussed the inconsistency involved between application of the doctrine of equivalents and of the doctrine that the claim and that alone must measure the monopoly. It pointed out that in the case of an improver, he is entitled to a narrow range of equivalents only; and that one who had been specific in matters of form, structure and relationship could not be permitted to depart from the plain meaning of the language he had adopted to claim for it a broad and generic construction. This case seems especially applicable here, where Crampton and the accused applied separately the desiderata of simplicity, compactness, sturdiness and permanent preassembly to two well-distinguished types of lever assembly appearing in the prior art. See also Lektophone Corp. v. Rola Corp., 282 U.S. 168, 51 S.Ct. 93, 75 L.Ed. 274; Claude Neon Lights v. E. Machlett & Son, 2 Cir., 36 F.2d 574; and the discussion of the subject in McSherry Mfg. Co. v. Dowagiac Mfg. Co., 6 Cir., 101 F. 716.

It does not seem necessary to consider the question of estoppel raised in the briefs.

The decree is affirmed as to claims 11, 12 and 13 on the question of invention but is reversed as to claim 2 and as to the finding of infringement. The case is remanded for the entry of a decree in accordance herewith.

SIMONS, Circuit Judge (dissenting in part).

I am in accord with the views expressed in the opinion of my colleagues in so far as it holds claim 2 of the patent in suit invalid for lack of sufficient disclosure, and in so far as it holds claims 11, 12 and 13 not infringed by the defendant. I dissent from the adjudication therein that claims 11, 12 and 13 are valid on the question of invention.

Just as there can be no infringement of a void patent, so it is clear to me that to hold patent claims valid as against a non-infringer, is to decide a hypothetical case. The recent case of Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 87 L.Ed. 1450, so specifically declares. Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263; Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290, 292; Cover v. Schwartz, 2 Cir., 133 F.2d 541, 545. Indeed, in Richard Irvin & Co. v. Westinghouse Air Brake Co., 2 Cir., 121 F.2d 429, 430, the court reversed a judgment that a patent was invalid "because that issue became moot as soon as it appeared that the defendant did not infringe." I doubt that we need go so far. Grant Paper Box Co. v. Russell Box Co., 1 Cir., 151 F.2d 886, 890; Sinclair & Carroll Co., Inc. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143. However, in Landis Machinery Co. v. Chaso Tool Co., Inc., 6 Cir., 141 F.2d 800, 805, fourteen patents with multiple claims were all held invalid and not infringed. Agreeing with the court below on its adjudication of non-infringement, we said in response to the concurring opinion in Aero Spark Plug Co. v. G. B. Corp., supra, the present majority concurring, "to what end shall we pursue our study of prior art * * * when if we arrive at conclusions in respect to validity, differing from those of the District Judge (i. e., that the patents are valid), we may not declare them, or direct an amendment of the decree to adjudicate validity proscribed by the Thomas & Betts case."