**BRADLEY et al. v. GREAT ATLANTIC & PACIFIC TEA CO.**

No. 5430.

District Court, E. D. Michigan, S. D.

April 30, 1948.

Beaman & Patch, of Jackson, Mich., for plaintiffs.

Munn, Liddy & Glaccum, of New York City (E. J. Balluff, of Detroit, Mich., of counsel), for defendant.

PICARD, District Judge.

The main issue in this case is whether the Patent Office should have granted letters on the device involved, since it has been stipulated that if plaintiff has a patentable invention defendant has infringed on claims 4, 5 and 6.

There is in fact but one plaintiff, Weingarten, assignee of Turnham's patent No. 2,242,408, who operates a chain of grocery stores in the state of Texas and was a pioneer in what we know today as the self-serve store—forerunner of the super-market.

History of the development of this species of business enterprise is desirable. One Saunders, back in 1917, started the first Piggly Wiggly, a self-serve grocery in which the customer went around the store selecting what he wanted, put it into a cart or basket and proceeded to a counter where the cashier checked the goods, collecting money for the purchases. Plaintiff was an early disciple and the idea of having the customer's help made a favorable impression with many in the business. Among its most desirable features was that it produced a situation where the patron did the work of lifting his own groceries, light and heavy, from the moment of purchase to his departure.

Up to 1937 customers checking out of a self-serve grocery were routed through an aisle on one side of which was an L. shaped counter with the cashier and cash register placed at the turn in the elbow of the L. The customer was obliged to take his purchases out of the cart or basket in front of the cashier, have them checked over, pay, place them back in some kind of a receptacle, perhaps a paper bag, and depart. The next person in line had to wait while the unloading, checking and reloading process was taken care of and in the late twenties and thirties this situation had begun to menace development of self-serve grocery stores—a hurdle then being jumped only by installation of additional checking out counters with the attendant lessening of floor space and increase in personnel.

It is plaintiff's claim that from the inauguration of self-serves the moment two customers stood in line ready to check out there was need for some method of minimizing the second person's wait. But whether this was true or not, surely by 1937 there was an overwhelming demand for some system that would make it unnecessary for customers to stand in line at the checking out station for long periods; and there was need for alleviation of discomforts and annoyances—including the mixing of merchandise—as one patron followed closely upon the heels of another in an impatient desire to be on his way home. Of course it can be easily accepted that the merchant who got his customers out as soon as they were ready to get out would have an added attraction why he should be patronized. And it was most important to the grocer that his facilities make possible a large volume because of the small margin of profit on which he must rely.

Naturally plaintiff was more aware of this draw-back than defendant which was just beginning to install the self-serve type of store. So various ideas to meet the difficulty were advanced, none of which solved the problem, until in 1937 Turnham, one of Weingarten's employees and through whom plaintiff claims, conceived the idea of extending the counter beyond the L. Here he placed a three sided pusher or tray which used the top of the counter for a bottom and was prevented from slipping off by guide rails on each side. The sides of the bottomless tray extended above the guide rails permitting the cashier to "pull" the groceries up before her, then push the

tray or pusher back on the counter so the next customer could be arranging his groceries within the tray while the person in front was checking out. This is the device upon which plaintiff's assignor received a patent. Later a handle was added to the side of the pusher nearest the checker to eliminate excessive physical effort and still later a weight was attached to the tray so that it was automatically pulled back into position for the next customer. These two improvements were not in the design of the patent as submitted but the part describing the method of utilization in the original does state that the pusher "frame may be grasped directly" (Patent, Page 2, Col. 1, line 35) to draw the groceries in front of the cashier.

Defendant contends that the Turnham method of speeding up "checking out" was the natural growth of the system; that there had been no real need for such acceleration before 1937; that similar devices had been used before; and that all skilled in the art saw the solution when the need actually became apparent as evidenced by the fact that practically all self-serve grocery stores put them in at the same time although their owners had never heard of or seen the Turnham combination.

We do not believe the facts justify defendant's position: First—hindsight is usually better than foresight. Invention is perplexing to one having need for its development only because he wonders why he or somebody else didn't think of it before. And second—today we are far removed from the delay or time consumed when it was necessary to telegraph information from one part of the country to the other by Indian runners, drums or smokesignals. With our modern method of relaying news it certainly wouldn't have taken very long before the novelty and efficiency of the Turnham pusher spread like wildfire throughout the trade. Add to this the fact that self-serve stores were springing up all over the country and the evidence shows conclusively that many, including defendant's representatives, were familiar with what was going on in the Weingarten stores. In fact, there is substantial evidence that such information was carried by means of photographs, magazine articles, talks and even by a cash register salesman.

So we need no stretch of reasoning to conclude that practically from the date of its entrance into the self-serve grocery field word had reached defendant that the Weingarten chain had in operation the then best answer to the "waiting in line" problem. Defendant makes no pretense of having worked out the system itself. It insists that the pusher system was a natural development; that like "Topsy" it just grew. But defendant and others had experimented or then began experimenting on their own and one ingenious device was a large wheel-shaped receptacle, divided into two parts, laid flat near the cashier, making it possible to check out one customer on one side of the wheel while another was unloading groceries on the other side in preparation for checking. Then there was the endless belt conveyor, the counter cart, and the use of two pieces of wood by the cashier to separate one customer's groceries from the customer's following. None was entirely satisfactory and today, practically every chain self-serve store organization in the country uses the device first installed in plaintiff's stores. It must be admitted, then, that Turnham made a valuable contribution to the efficiency of the self-serve store type of merchandising.

Conclusions of Law.

The case law dealing with patents has laid down certain cardinal principles recognized by those who have specialized in this practice.

First, a patent, having been granted by the Patent Office, carries a presumption that it is valid and the burden of proof to upset that presumption rests upon the person advocating invalidity. And it is not a presumption that may be destroyed easily, as for example by such evidence recognized as sufficient in a civil case. In fact, the courts have consistently held that the presumption of validity is so great that it may be removed only by evidence that rises to the dignity of "perhaps beyond a reasonable doubt." Here the stipulation admitting infringement by defendant of claims 4, 5 and 6 is in the record, so we

are not concerned with that question, but if defendant is unsuccessful in overcoming the presumption of validity, plaintiff must prevail. That is defendant's burden in the case at bar. The rule of our own circuit is found in W-R Co. v. Sova, 6 Cir., 106 F.2d 478, 481, cert. denied 309 U.S. 663, 60 S.Ct. 591, 84 L.Ed. 1011 where the court said:

"The presumptive validity of a patent is so weighty that the defense of invention by another must be established by the clearest proof, perhaps beyond a reasonable doubt and a fortiori the same rule applies to the defense of prior public use or sale by the inventor."

Also see Walker on Patents, Sec. 116, (Deller Ed.) Sec. 63 page 300 and decisions cited; Mumm v. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983; Westinghouse Co. v. Formica Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316; Forestek Plating & Mfg. Co. v. Knapp-Monarch Co., 6 Cir., 106 F.2d 554; Allison Coupon Co. v. Bank of Commerce & Savings, 72 App.D.C. 82, 111 F.2d 664; Dodge v. Post, C.C., 76 F. 807; Motor Improvements v. General Motors Corporation, 6 Cir., 49 F.2d 543.

What then are the earmarks of an invention?

■ To begin with the device must present novel features, which may be as stated in National Hollow Brake-Beam Co. v. Interchangeable Brake-Beam Co., 8 Cir., 106 F. 693, 706:

" * * * a new combination of old elements, whereby a new and useful result is produced, or an old result is attained in a more facile, economical, and efficient way, * * *"

The bottomless tray is not novel, as note, for example, the well known pool rack. Neither is a checking-out counter nor the use of guide rails. These have been seen in self-serve restaurants for years. However, the extension to the checking-out counter was apparently something new, as it automatically placed the register farther up on the checking-out aisle, and the use of the bottomless tray on that extension, self-unloading its contends right in front of the cashier, was decidedly a novel feature. Other than new solution inventions, very few patent devices are composed of new elements. But here we have the combination of the bottomless tray on the extension counter, easily moved into position before the cashier by drawing it to her between guide rails. This makes it unnecessary for the housewife to push her purchases forward, for a pusher boy to help her, or for the cashier to reach out and by use of her arm exert the necessary force to draw the purchases to her. Then follows the effortless return of the pusher tray for use by the next customer, while customer No. 1. is being checked out. No one who has ever traded at one of these self-serve stores can deny that even today with this device, plus added cashiers and counters, this checking-out problem is still a bugaboo of the business because of the annoyance of waiting to the ever present impatient customer; yet it was buffeted from pillar to post without any solution until plaintiff's invention.

The Turnham system was not only novel but a great time, space and personnel saver.

Was it useful?

■ It was so useful that after seeking other ways to accomplish the same thing practically all self-serve stores, including defendant's, have copied and now use it. If a device is novel and useful that is strong evidence of its patentability. Forestek Plating & Mfg. Co. v. Knapp-Monarch Co., supra.

Did this device meet with commercial success?

■ This is important since "commercial success of a patented device and the absence of the other competing devices is strong evidence of utility and patentability." Walker on Patents, Vol. 1, Sec. 71, page 322 (Deller Ed.) with citations.

■ Challenging such success defendant emphasizes the fact that plaintiff has succeeded in getting only one line of stores to become licensed. We do not believe that commercial success is gauged by the number of concerns willing to pay whatever cost is necessary for the privilege of using a new invention. There may have been an honest difference of opinion right from the start as to whether this pusher was paten-

table and the information that this defendant or others were going to make this point an issue in the courts might have deterred others. What we Americans often refer to as "the grapevine" might have been in operation and a "wait and see" policy adopted. If commercial success depends upon the number of licenses sold, this patent does not meet the test, but so to hold would invite conspiracy against all future inventors who may find their invention being used by everybody and no one paying the justified tribute. We believe that commercial success simply means "much use in the trade."

■ In the case at bar the device is useful, it is novel, it is in our opinion a commercial success because the great majority of other self-serves are using it and the evidence is most convincing that nobody thought of the solution before Turnham did; all of which is evidence of its patentability. Furthermore, it admittedly gained the approval of experts in the trade without extensive advertising or intensive selling pressure. Forestek Plating & Mfg. Co., v. Knapp-Monarch Co., supra; Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721; Crampton Mfg. Co. v. Crampton, 6 Cir., 153 F.2d 543; Goodwin v. Borg-Warner Corporation, 6 Cir., 157 F.2d 267; Campbell v. Mueller, 6 Cir., 159 F.2d 803; Williams Mfg. Co. v. United Shoe Machinery Corp., 316 U.S. 364, 62 S.Ct. 1179, 86 L. Ed. 1537.

■ And this court recognizes that this is a simple, inexpensive device that would pale into insignificance before a Deisel engine or radar machine. But the fact that it is simple and inexpensive doesn't detract from, but rather adds to, the presumption of patentability.

"Cheapness of construction, simplicity of construction, and operation and ease of operation, as compared with prior structure are all indications of invention." Walker on Patents, Vol. 1, Sec. 30 (Deller's Ed.) page 189 and citations.

See also Hughes Tool Co. v. International Supply Co., 10 Cir., 47 F.2d 490; Skinner Bros. Belting Co. v. Oil Well Improvements Co., 10 Cir., 54 F.2d 896.

■ Still these enumerated characteristics of themselves are not enough. The affirmative meeting of these tests is persuasive but not conclusive and its commercial success can be of help to the article's patentability only in close cases. On the other hand, commercial success alone, "should in a close case, tip the scales in favor of patentability." Crampton Mfg. Co. v. Crampton, supra [153 F.2d 545]; Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 92 F.2d 330; Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., supra; Goodwin v. Borg-Warner Corporation, supra; Campbell v. Mueller, supra.

■ So we approach the next question to-wit, whether or not the patented article rises to the dignity of invention. Is there the "flash of creative genius" (Cuno Corp, v. Automatic Devices Corp., 314 U.S. 84, 85, 62 S.Ct. 37, 41, 86 L.Ed. 58) to be found in this contrivance, or would one skilled in the art have naturally come forth with the same kind of a mechanism?

In the Cuno case the court said:

"That is to say the new device, however useful it may be, must reveal the flash of creative genius not merely the skill of the calling. If it fails, it has not established its right to a private grant on the public domain."

We believe that Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., supra, is the best answer to the extent our courts will go to protect the brain child of an inventor and gives some light on what creative genius may be. For years the dry cell battery had been placed on the market by manufacturers knowing its defect of leakage. Then the patentee simply encased the battery in a leak-proof container. That's all there was to it. Why somebody hadn't thought of this before was an enigma, not only to the uninitiated but to those who were skilled in the art and knew something about batteries, their manufacture, their use and their defects. The patent was held valid, the District Court quoting the Supreme Court's decision in Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464 at page 474, 55 S.Ct. 449, at page 454, 79 L.Ed. 997, to-wit:

"Where the method or device satisfies an old and recognized want, invention is to be inferred, rather than the exercise of mechanical skill. For mere skill of the art would normally have been called into action by the generally known want." Ray-O-Vac v. Goodyear Tire & Rubber Co., D.C., 45 F.Supp. 927, affirmed in 7 Cir., 136 F.2d 159, and by the Supreme Court in 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721.

In the case at bar the witnesses who are in a position to know, who helped formulate, develope and popularize the self-serve grocery stores, testify that the problem in 1937 had been in existence for twenty years. Perhaps this is an exaggeration but there is no doubt that during the late twenties and throughout the thirties, particularly on the housewife's main shopping day, Saturday, the future success of this type of merchandising hung in the balance. This threat loomed as an approaching overwhelming flood in anticipation of the return of prosperity to this country. By 1937 the situation bordered on the chaotic; the cactus had bloomed into a formidable piece of vegetation in the path of the self-serve store progress. What Turnham's invention did to partially trample this weed underfoot has been heretofore stated, and to those advantages must be added the fact that it increased the efficiency of each checking counter at least thirty per cent. What more evidence of the "flash of creative genius" could be required?

Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 12, 91 L.Ed. 3, relied upon by defendant, is not a challenge as we interpret that case. The plaintiff does use the word "means" in its patent claims but we do not understand the Halliburton case to infer that from that date on the use of that particular word is taboo in all patent claims. Many patents in the past and certainly many since the date of the Halliburton decision have referred to the "means" by which the patented article is supposed to function. We think that the objection of the Supreme Court to the legality of the patent in the Halliburton case was chiefly because not one of the claims rested or even suggested the physical structure of the acoustical resonator. Further-

more, it said: " * * * the broadness, ambiguity, and overhanging threat of the functional claim of Walker became apparent." And that if the patent was valid it barred anyone from using an oil well device heretofore or hereafter invented which clearly and distinctly caught and recorded echoes from tubing joints with regularity. Turnham's claims are specific. The essential structures, the extension and the bottomless self-unloading frame, are described as such and functional language is not being used "at the exact point of novelty." Halliburton Oil Well Cementing Co. v. Walker, supra. Anyone else who can invent a better way of securing similar or even superior results is not barred and just how Turham's device functions is not ambiguous but is clearly recited. That, in our opinion, is the difference between the two cases.

There remains then but one other major question.

What does the prior art show? We have examined the contentions presented and fortunately for plaintiff, according to the file wrapper, the Patent Office examined the prior art before the patent was granted—perhaps not all those submitted by defendant but those apparently believed by it to be nearest to the patent being applied for. Of course when one seeks letters from the Patent Office there is no adversary to be met or controversial proof submitted. There is no third party opposing the application and the fact that such a petition is being heard is probably not even known to those on the outside who may be affected. Still the examiner is supposed to make inquiry and search diligently to learn whether the new application may be anticipated by patents heretofore granted. During the trial of this case and after examining all previous patents deemed as being at all similar to the patent before us—including the many advanced by defendant—we indicated that we could see no similarity between any of those patents and the one at bar. We are still of this opinion. True, any three sided bottomless tray might have been used. Even the pool rack with the handle. But as stated in Carnegie Steel Co. v. Cambria Iron Co., 185 U.S.

403, at page 422, 22 S.Ct. 698, at page 706, 46 L.Ed. 968:

"It is not sufficient to show a piece of mechanism by which the process might have been performed."

Evidently the Patent Office reached the same conclusion and the significance of its determination of patentability has the sanction of many courts, including again our own sixth circuit. In William's Mfg. Co. v. United Shoe Mach. Corp., 6 Cir., 121 F.2d 273, at page 277, we read:

"To the presumption of validity that attaches to a granted patent, where the most pertinent prior art has been cited against it in the patent office, there must probably now be added the force of a growing recognition of finality that is generally being accorded to administrative determinations supported by evidence, on the ground that the administrative agency is expected to have developed an expertness in its specific field beyond what may be expected from the courts wherein adjudications range the whole field of human controversies."

See also Detroit Motor Appliance Co. v. Burke, D.C., 4 F.2d 118; Gairing Tool Co. v. Eclipse Interchangeable Counterbore Co., 6 Cir., 48 F.2d 73; Adler Sign Letter Co. v. Wagner Sign Service, 7 Cir., 112 F.2d 264.

By the overwhelming weight of authority it is apparent to this court that a patent granted by our Patent Office, especially after a review of the prior art by men who are supposedly experts in their field, should not be lightly disturbed. Certainly it should not be nullified by one who in uncertain, wavering testimony claims he saw the same device in use some thirty years ago when he was a boy of ten or twelve years of age.

"A fair doubt as to its reliability is always sufficient to dispose of testimony of this character." Mack v. Spencer Optical Manuf'g Co., C.C., 52 F. 819, 821.

See also Buckeye Incubator Co. v. Wolf, D.C., 291 F. 253 and cases cited.

To this we add that if the presumption of validity is of such gossamer fabric as to be destroyed by verbal testimony of one lone witness unsupported by written or printed matter, then there is no presumption worthy of the name. The infringer "bears a heavy burden of persuasion," Williams Mfg. Co. v. United Shoe Mach. Corporation, supra. Drake's testimony was of no value, and certainly defendant having admitted infringement has not satisfied the necessary requirement of the weight of the evidence to overcome the presumption of such validity. And while this alone would be sufficient, in addition, we believe that plaintiff's invention on its own merit meets the several tests of patentability as we have attempted to outline herein.

Finally, and although we deem the point immaterial, this court holds that plaintiff has not forsaken claims 1, 2 and 3. We follow, on the contrary, the reasoning of Ford Motor Co. v. Gordon Form Lathe Co., 6 Cir., 90 F.2d 999, to the effect that having chosen to rely upon claims 4, 5 and 6 this serves only as an amendment to the pleadings.

For the reasons herein given it is our conviction that plaintiff must prevail.