**WHITMAN et al. v. ANDRUS.**

**ANDRUS et al. v. WHITMAN et al.**

**BESSER MFG. CO. v. WHITMAN.**

**Nos. 11364–11366.**

United States Court of Appeals
Sixth Circuit.

Feb. 19, 1952.

L. M. Forster and I. J. Farley, Detroit, Mich., Farley, Forster & Farley, Detroit, Mich., on brief, for Hamlin F. Andrus et al. and Besser Mfg. Co.

Frank E. Liverance, Jr., Grand Rapids, Mich., Frank E. Liverance, Jr., Grand Rapids, Mich., on brief, for John A. Whitman et al.

Before HICKS, Chief Judge, and SIMONS and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

Involved in this controversy are questions of validity and infringement in respect to three patents in the art of fabricating concrete building blocks. The first patent, in the order of our consideration, is one to Gelbman et al. No. 2,275,676 for a concrete block machine granted March 10, 1942 upon an application filed August 28, 1937; the second, likewise to Gelbman et al., is for a method for making building blocks No. 2,366,780, granted January 9, 1945 upon an application filed August 28, 1937; the third is Scott patent No. 2,106,329, granted January 25, 1938 upon an application made May 25, 1927 and renewed March 21, 1936. It is designated "an apparatus for treating materials."

The owners of the Gelbman machine and method patents brought suits against Whitman of Midland, Michigan, and Wenzel and Goetsch of Rogers City, each of whom uses one alleged infringing machine. Later, the Besser Manufacturing Company of Alpena, Michigan, brought suit against Whitman for alleged infringement of the Scott patent which Besser owned. The alleged infringing machines were manufactured by The Lith-I-Bar Company, of Holland, Michigan, which undertook the defenses in the district court. The three suits were consolidated for trial, are here on a single record and were argued together. The district court held claims 1, 2, 3, and 4 of the Gelbman machine patent valid and infringed, the two claims of the method patent not infringed, and the Scott patent not infringed. The owners of the apparatus patent support the decree below in its holding of validity and infringement; challenge the holding of non-infringement of the method patent and Besser appeals from the adjudication of non-infringement of the Scott patent. The users seek to set aside the decree adjudicating the machine patent in respect to both validity and infringement, support the holding of non-infringement of the method patent but insist upon its invalidity, and while agreeing that they do not infringe the Scott patent, renew their attack upon its validity, if the Scott patent was held valid which they dispute.

It appears to be agreed that neither of the Gelbman patents nor the Scott patent received commercial embodiment. Besser, however, manufactured a cement block machine which was successfully marketed and which is said to incorporate elements of Gelbman and Scott. Our study of the problems presented has been made difficult by the comparisons made throughout the record by counsel, witnesses, and court, of the accused structures with the Besser

machine rather than with the claims and disclosures of the patents in suit.

It is necessary, at the outset, to recite briefly the development of the art as it came from Besser himself who had been active in it for forty-five years. His earliest experience was with hand tamp devices which would produce not ·more than one hundred fifty blocks a day. A hand tamp apparatus was merely a mold resting on a support into which concrete was shoveled and tamped by hand. In 1909 or 1910, there came into use a power machine for doing the tamping. Along about 1914, automatic means were introduced by which the material was set into the mold, tamped and finished by power. These increased production to two or three thousand blocks per man day. Other improvements followed including a stripper means whereby the blocks were retained upon a pallet which might hold three blocks and upon which the blocks could be left to harden. In the late thirties, there was a marked change-over to ·vibration to compact the block in the mold and the Besser Company changed from tamping to vibration. This required considerable experimentation in determining the best speed for the vibrating member, power of motors, and other elements to give desired results. Besser employed the teachings of the Scott patent which was for a vibrating machine and the innovations of Gelbman incorporated in the Gelbman application of 1937 long before the Gelbman patent issued. His introduction to effective vibration really came, he says, from Gelbman. Other machines using the vibration ·principle that had been brought out during this period or before had failed to come into general use because in them the whole machine vibrated rather than merely the mold. The use of vibration as taught by Gelbman doubled production and improved the result· as compared with the tamping devices be-cause they avoided the wear on the machine which the tampers produced and gave a more even texture to the block, since the concrete was put into the mold in mass rather than by steps between successive tamping impulses which left laminations in the block.

The Gelbman machine patent had a rough course through the patent office and was not granted until March 10, 1942, though the application was filed in 1937. It issued only after an appeal from an adverse ruling of the examiner to the Board of Appeals. Of the Gelbman claims allowed, claim 4 printed in the margin [1] is sufficiently typical and perhaps. broader than the others. Of the apparatus claimed, particularly described in the specification and depicted in the drawings, the appellees say that notwithstanding higher standards of invention imposed by recent court decisions, the apparatus constituted a patentable advance in the art by eliminating transmission of mold vibration to the feed drawer; that ·from this flowed three marked advantages. It eliminated undesirable or unwanted packing of the concrete in the main supply hopper; it achieved a substantial reduction in the wear of adjacent parts of the mold and feed drawer by eliminating metal-to-metal contact between them and the damping of mold vibration incident to· this metal-to-metal contact. No one, they say, prior to Gelbman was able to accomplish the desired elimination of metal-to-metal vibration transmission. It was clearly not obvious, they urge, nor within the skill of earlier inventors, in view of this long existing and wide-spread art to accomplish a result which had theretofore eluded them.

This brings us to a more specific consideration of the prior art. Gelbman was not, nor did he claim to be, an innovator in the use of vibration to compact concrete material in a mold. Such vibration is disclosed in Easterday No. 1,523,936, as early

[1] 4. In a building block machine, a frame for the block machine a mold for making concrete or the like blocks, means for vibrating or jolting said mold to pack the concrete material therein during making of said blocks, a feed drawer to supply the mold with concrete material as need-ed, and a track system mounted on said frame for the feed drawer to ride on and holding the feed drawer from touching the mold preventing the transmission of vibrations . from the mold to the feed drawer.

as 1922. Stockwell No. 384,295 had taught the advantage to be gained by jarring or shaking the material for a certain length of time, as early as 1888, though it does not seem necessary, in view of later patents, to consider nice distinctions between jarring and vibration. Shinn No. 2,036,367, which was not before the patent office, disclosed a shaking movement transmitted to the molds to settle the concrete during the filling and molding operation and Dahl No. 1,777,660 disclosed means for effective automatic vibration in the mold after being filled. A sliding feed drawer intermediate the hopper and the mold by which a measured charge could be discharged into the mold was not new, either singly or in combination with other elements. It is disclosed in Dahl and Shinn as well as in other patents. Ejection means for the finished block is also not new. A choice of ejection means widely used in the machine arts was open to the inventor, and is sufficiently disclosed in this specific art. That which is more urgently urged as new in Gelbman is the means provided for holding the feed drawer from touching the mold so as to prevent the transmission of vibrations from the mold to the feed drawer. It is this element that is asserted to mark the major advance made by the patent and to provide those specific advantages already indicated. Upon it the appellees seem mainly to pin their faith. This leads us to a consideration of the relationship between a new concept and the means or instrumentalities by which the new idea may be put into practice.

As was succinctly pointed out by Judge Denison of this court in Reo Motor Car Company v. Gear Grinding Machine Company, 6 Cir., 42 F.2d 965 at pages 967, 968: "We think it usually will be true * * * that where there are coincident method, machine and product inventions, the underlying meritorious inventive thought will be found in one of the three, and the other two will be relatively collateral. * * * The improver must first conceive, in a general way, the method or plan for such grinding, and must then devise means for effectively and sufficiently maintaining the grinding shape. Until this can be done, the conception is not an invention, because it is useless."

As said later by Judge Hickenlooper, writing for this court, in Nestle-Le Mur Company v. Eugene, 6 Cir., 55 F.2d 854, 856, 857: "Where one discovers a new and useful process for accomplishing a given result, is the obvious mechanical or electrical device, obvious to anyone to whom the proposed method is disclosed, patentable apart from the process? We are constrained to the opinion that it is not." See also Corning v. Burden, 15 How. 252, 267, 14 L.Ed. 683; Naivette, Inc., v. Bishinger, 6 Cir., 61 F.2d 433, 435, 436.

Assuming, but not deciding, that there was inventive thought in the concept of keeping the feed drawer from touching the mold so as to prevent the transmission of vibration to it from the mold, the concept itself was not patentable unless it became materialized by means themselves new and not within the expected skill of the art. So viewing the problem, it seems to us that the provision for a track system mounted on the platform of a cement block machine, so as to hold a sliding feed drawer from touching the mold, was a perfectly obvious device and no inventive thought may be perceived therein whether we apply modern or older concepts of invention. We hold the claims in suit invalid both for anticipation and lack of invention.

The Gelbman method patent as finally allowed contains but two claims, both printed in the margin.[2] The district judge

2. 1. A method for making a building block, consisting in moving a feed drawer with plastic material across a vibrating mold by starting on one side of the mold and moving the said drawer until it is superimposed on the mold to fill and pack the mold, quickly moving said feed drawer off the mold to strip excess plastic material from the mold, and quickly applying a pressure head upon the top of the material in the mold during continued vibration of said mold.

2. A method for making a building block, consisting in moving a feed drawer with plastic material across a mold by starting on one side of the mold and

was in considerable doubt of their validity but held them not infringed by the accused structures and dismissed the bill. We do not share his doubt. Insofar as the claims describe a method for making building blocks consisting of moving a feed drawer across a vibrating mold until it is superimposed on the mold to fill and pack it, the claims are anticipated by the prior art in patents already cited. Whether there is substantial difference in the claims seems to call for a nice distinction between the phrase "across a vibrating mold" and the wording "vibrating the mold during engagement of said feed drawer."

■ The difference in operation pointed out is that under claim 1 the vibrations begin to compact the material as soon as the first of the load begins to drop into the mold and that under the second vibration begins when the feed drawer is superimposed upon the mold. However, since there is no interpretation of the terms as words of art, it would seem to us that the phrasing must be given their ordinary meaning and that the feed drawer engages the mold as soon as any part of its open bottom leaves the protection of the plate over which it passes. The distinction that is urged is motivated by the charge of infringement, since the accused machines begin vibrating only when the feed drawer is over the mold. Insofar as the claims require, as a step in the method, the application of a pressure head upon the top of the material in the mold, that was anticipated by the tamping or dynamic pressure earlier disclosed, if there is equivalence in these pressures, as here argued. But claim 2 describes a yielding pressure head on the material in the mold and the argument is that this is equivalent to the tamping used in the accused machines. It is specified, however, that tamping or dynamic pressure results in an inferior block because the force engendered too greatly compacts the upper part of the material making too heavy a block. So the term

"yielding pressure" is clearly a limitation, and the accused machines do not employ it. This calls for an application of the principle so carefully developed by this court in D'Arcy Spring Company v. Marshall Ventilated Mattress Company, 6 Cir., 259 F. 236, 240, wherein it was held that: "Where the claim defines an element in terms of its form, material, location or function, thereby apparently creating an express limitation, where that limitation pertains to the inventive step rather than to its mere environment, and where it imports a substantial function which the patentee considered of importance to his invention, the court cannot be permitted to say that other forms, which the inventor thus declared not equivalent to what he claimed as his invention, are nevertheless to be treated as equivalent, even though the court may conclude that his actual invention was of a scope which would have permitted the broader equivalency."

We have applied this principle in many cases, including Hollingshead v. Bassick Mfg. Co., 6 Cir., 73 F.2d 543, 548; Firestone Tire & Rubber Co. v. U. S. Rubber Co., 6 Cir., 79 F.2d 948 at page 955; United Shoe Machinery Corp. v. O'Donnell, 6 Cir., 84 F. 383, 386; Shearer v. Atlas Radio Co., 6 Cir., 94 F.2d 304, 306; A. O. Smith Corp. v. Lincoln Electric Co., 6 Cir., 82 F.2d 226, 229.

What is said to be new in the method is the continued vibration of the mold during pressure after the feed drawer is removed. In argument to the examiner Gelbman pointed out that his application differed from Stockwell in that Stockwell continued vibration after the heavy ring was applied and before the dry mix had settled to its lowest point, whereas Gelbman began vibration immediately. There was no invention in applying this timed vibration to material of differing constituency once the principle of vibration was understood, and Taylor had used vibration with other and drier materials.

moving the said drawer until it is superimposed on the mold, vibrating the mold during engagement of said feed drawer to pack said material therein, moving said feed drawer off the mold during continued vibration thereof, and continuing the vibration of said mold and engaging a yielding pressure head on the material in the mold during said latter vibration period.

We are not dealing here with estoppel but the claims of a patent are to be interpreted not only in the light of the specification but also with reference to its file-wrapper history. Schriber-Schroth v. Cleveland Trust Company, 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132.

It will be observed that insulation of the feedbox from vibration is not included in the claims, as a step in the process. The specification, however, recites that the inventor had discovered that vibrations have a tendency of rattling machines to pieces, that attempts had been made to insulate the vibrations, that if the vibrations be transmitted, the feed drawer cutoff plate would vibrate and compact the concrete in the chute. Of these prior art machine infirmities and their proposed cure by the patented method, it may be said that elimination of vibration in the machine to prevent its impairment is not truly a step in a process for making cement blocks. But if it be, this interpretation of the claims by the specification but described the organization and function of a machine and are invalid because functional. It may also be said that insulation of vibration to prevent compacting of material in the chute or feed drawer, even if novel, was of doubtful or limited utility for when Besser undertook to build a machine to embody the Gelbman teachings and to practice the Gelbman method he found it necessary to install agitators to free the material and cause it to flow into the mold.

Our principal ground for holding the claims invalid must, however, be the failure of the method patent to fully disclose the alleged inventive concept so that the method may be practiced by the public when the patentee's monopoly has expired. This is made clear by the testimony of Besser, a highly experienced manufacturer of cement blocks by the vibration method. Though his company owned the Scott patent, though he was familiar with the Gelbman development long before the patent issued and with an earlier Gelbman patent, not in suit, it was necessary for him before he could effectively make concrete blocks by the Gelbman method to do considerable experimenting in trying out various speeds of the vibrating machine, various weights to provide necessary vibrating forces, various sizes of motors and determine the proper amplitude of vibration to achieve the claimed results. There is no mention in the specification of the vibrating force required or its amplitude nor do the drawings in any way assist us. 38 Stat. 958, 35 U.S.C.A. § 33 requires full disclosure to define the boundaries of a patent monopoly. Great Atlantic & Pacific Tea Company v. Super Market Equipment Corporation, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Schriber-Schroth v. Cleveland Trust Company, 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132; Permutit Company v. Graver Corporation, 284 U.S. 52, 60, 52 S.Ct. 53, 76 L.Ed. 163.

We are aware that the disclosures of a patent are addressed to those skilled in the art but it may not be disputed upon this record that Besser was highly experienced, had followed development attentively, was the owner of the Scott patent dealing with the vibration method, had taken licenses under the Gelbman patents yet could not make a successful block without organizing a new machine, incorporating elements of both Gelbman and Scott and undertaking extensive experiments of his own before it could be constructed to successfully function. If the alleged inventive thought abided merely in very rapid vibration in the mold, this was not new to the Gelbman method. We are also aware that many patent disclosures leave to practical men the necessity of routine adjustment, positioning of parts and the like before an invention can be made commercially available and that patent drawings are suggestive and are not blueprints for constructing a machine or practicing a method, but Besser's experimentation was basic to a useful method and imperative to disclose, even to those skilled in the art, the successful functioning of the patented method. We think the claims are invalid for failure to fully disclose a complete operational method.

The claims in suit of the Scott patent are 1 and 6 which are printed in the margin.[3] The district court in its original findings and conclusions held the Scott patent invalid because it disclosed an aggregation rather than a true combination and that it was not infringed by the accused structures. Upon rehearing it withdrew its holding that Scott disclosed an aggregation rather than a true combination because Scott achieved a better block, made more cheaply, at greater speed, adding however that it changed no other part of the opinion. This falls somewhat short of an unequivocal holding that the Scott patent claims were valid. Perhaps this was in response to the decision in Electrical Fittings Corporation v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263, where a decree for validity against a non-infringer was reversed with directions to reform the decree to eliminate the holding of validity, for "To hold a patent valid if it is not infringed is to decide a hypothetical case." While there has been phrasing in various cases which suggest that proper procedure requires in the public interest a decision of both issues where validity and infringement have been charged and challenged, Electrical Fittings Corporation v. Thomas & Betts, supra, has, however, never been specifically overruled or disapproved. See Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450 and compare Crampton Manufacturing Company v. Crampton, 6 Cir., 153 F.2d 543 with Cover v. Schwartz, 2 Cir., 133 F.2d 541, 545 and Richard Irvin & Company v. Westinghouse Airbrake Company, 2 Cir., 121 F.2d 429.

Our view is that the court was right in the first place. The uniting of vibration and ejecting means in a unitary structure was but an aggregation, each performing an old function in substantially the same old way. Toledo Pressed Steel Company v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334; Lincoln Engineering Company v. Stewart-Warner Corporation, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; Great Atlantic & Pacific Tea Company v. Super-Market Equipment Corporation, supra.

In any event, we find nothing new or disclosing inventive thought over prior art in Scott. Means for vibrating the mold were old. There was nothing new in a resilient mounting. Such mounting was explained by Taylor patent No. 899,441, granted September 22, 1908. The challenge to Taylor on the ground that it was a patent in a non-analogous art must be rejected. While Taylor described his patent as an apparatus for concentrating materials and was directed to the concentrating of finely divided ores, coal or minerals in general, so was Scott. He entitled his patent as "an apparatus for treating materials." While he illustrated it by treatment of concrete, he described it as applying to all building materials. As was said in Willett Manufacturing Company v. Root Springs Scraper Company, 55 F.2d 858, 859, by this court, "Choice of one or another of the available types of power * * * is well within the domain of selection open to the public." And so here, adaption of vibration, as in Stockwell, with vibrating means rigidly mounted or vibrating means resiliently mounted, as in Taylor, did not require inventive thought. Claims 1 and 6 of Scott are invalid.

The following results follow, from what we have said.

The decree is amended by excising therefrom the remedy based on a holding that the Gelbman machine patent is valid and infringed and the cause remanded with instructions to dismiss the bill which so charges; the decree in all other respects is affirmed.

3. 1. An apparatus for treating a material comprising a mold for the material, a frame, springs carried by the frame for supporting the mold, means for vibrating the mold, and means for ejecting the product from the mold after vibration.

6. In apparatus for the molding of plastic materials like concrete, a mold for receiving the material, a supporting frame, a resilient means interposed between the mold and the frame whereby the mold can be vibrated substantially independently of the frame, means for applying vibration to the mold, and means for removing the formed mass of material from the mold, said last means including elements mounted upon the frame.